# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 11, 2022

Lyle W. Cayce
Clerk

No. 21-60456

Rachel Harris, *Guardian of Steven Jessie Harris, on behalf of Steven Jessie Harris*,

*Plaintiff—Appellee*,

*versus*

Clay County, Mississippi; Laddie Huffman, *Former Sheriff, in his Individual and Official Capacities*; Eddie Scott, *Sheriff, in his Individual and Official Capacities*,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 1:18-CV-167

Before Smith, Costa, and Wilson, *Circuit Judges*.
Gregg Costa, *Circuit Judge*:

When a defendant is found incompetent to stand trial with no reasonable expectation of restored competency, the state must either civilly commit the defendant or release him. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972). That simple commit-or-release rule was not followed in this case. Steven Harris was found incompetent to stand trial, and his civil commitment proceeding was dismissed. Yet Harris stayed in jail for six more years. This

No. 21-60456

suit challenges his years-long detention when there was no basis to hold him. We consider whether his jailers are entitled to qualified immunity.

I

A

This case stems from a horrific crime spree in 2005.[1]  Harris was charged with murdering his father, shooting three law enforcement officers, shooting into occupied vehicles, carjacking, and kidnapping.  He pleaded not guilty in a Clay County circuit court,[2] and the court ordered that he be held in custody without bail.

While Harris was in custody, his counsel requested a mental evaluation to determine Harris's competency to face trial.  Harris had a long history of suffering from schizophrenia.  The circuit court agreed to the evaluation and transferred him to a hospital.  There, doctors concluded that there was "no substantial probability that Mr. Harris [could] be restored to competence to proceed legally in the foreseeable future."

Harris returned to jail and awaited competency proceedings.  The court held a hearing on October 12, 2010 and agreed with the doctors that Harris was not competent.  It therefore ordered Mississippi to pursue civil commitment proceedings in the chancery court.  Importantly, the court also

---

[1] Given the summary judgment posture, we recount the facts in the light most favorable to Harris.  *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (emphasizing that this basic summary judgment principle applies in qualified immunity cases).

[2] Mississippi circuit courts hear felony criminal proceedings and civil lawsuits. *About the Courts*, STATE OF MISSISSIPPI JUDICIARY, https://courts.ms.gov/ aboutcourts/aboutthecourts.php (last visited June 26, 2022).  Chancery courts have jurisdiction over matters of equity, including, as relevant here, civil commitment proceedings. *Id.*

2

ruled on Harris's detention status:    He should be held "until the determination of said civil proceedings."

But the civil commitment case did not last long.  On the same day the circuit court removed Harris's criminal case from its active docket (October 20, 2010), the chancery court dismissed the just-filed commitment proceeding for lack of jurisdiction.  It based that dismissal on the pending criminal charges—yes, the charges that had just become inactive—in the circuit court.  The circuit court apparently never caught wind of the chancery court's dismissal, sending Harris into legal limbo.

No one disputes that Harris remained in Clay County jail from that point forward.  It is hard to explain, then, what happened next.  On October 25, 2010, Sheriff Laddie Huffman and Deputy Eddie Scott, the ones in charge of the jail, signed a "Diligence Declaration."  The declaration purportedly related to a separate indictment against Harris for assaulting a jailer while in custody.[3]  In that declaration, they said the following: "After diligent search and inquiry, [we] have been unable to find the within named Steven J. Harris in [our] county."  It appears that they submitted the declaration to the circuit court—further misleading the circuit court that the civil commitment proceedings went according to plan.

Fast forward to 2012.  The district attorney prosecuting Harris's case, Forrest Allgood, found out about the state court snafu.  After putting the pieces together, he went to Sheriff Huffman to inquire about Harris's confinement.  This time Huffman acknowledged that Harris was still in jail but indicated that his mental health seemed to be improving.  So Allgood submitted a Motion for Reevaluation to the circuit court, asking the court to

---

[3] That indictment was filed under seal.  The seal was never lifted because Harris was never served with the indictment.

No. 21-60456

again determine whether Harris was competent to stand trial. The circuit court never ruled on that motion, perhaps because the case was on its inactive docket, and Allgood never followed up. Harris stayed in jail.

Four more years passed with no change. That is, until a Mississippi news outlet started asking questions about the case.[4] At that point, Scott, who had been elected Sheriff, reached out to the newly elected district attorney to "try[] to push and get things moving" in Harris's case. And then—the day before the newspaper published its article—the district attorney filed a motion for the chancery court to reconsider its dismissal of Harris's civil commitment case.

Things moved fast after the reconsideration motion. After holding that its earlier dismissal was inadvertent, the chancery court finally took up the civil case in June 2016. The court determined that Harris was a danger to himself and others, so it committed him to a medical facility. While there, Harris's mental capacity was reevaluated one last time. The result was the same—he was not competent to stand trial and had no hope of regaining competence. The circuit court dismissed his criminal charges in 2017. Harris was released to his family soon after. He continues to receive medical care for his mental disorders.

---

[4] *See* Jerry Mitchell, *Man in Mississippi Jail 11 Years Without Trial*, CLARION LEDGER (May 21, 2016), https://www.clarionledger.com/story/news/2016/05/21/man-still-in-mississippi-jail-11-years-later/84253880/.

No. 21-60456

B

Harris's mother, on his behalf, sued District Attorney Allgood, Sheriffs Huffman and Scott, and Clay County under Section 1983.[5] The suit alleges that the defendants violated Harris's Fourteenth Amendment due process rights by unlawfully detaining him for years. The complaint also contends that, at one point, Huffman held Harris down and forced him to take unwanted medication. As to Clay County, Harris argued that Sheriffs Huffman and Scott were final policymakers, making the county liable under *Monell*. The defendants sought summary judgment; Harris responded with a motion for partial summary judgment.

The district court first dismissed Allgood from the case, concluding he had absolute prosecutorial immunity and qualified immunity. It came out the other way as to Huffman and Scott. It determined that they were not entitled to qualified immunity on the detention claim because—taking Harris's account as true—their constitutional violations were obvious. It denied summary judgment to Clay County too, finding that there was strong evidence that Huffman and Scott were final policymakers for the county. Next, the court addressed the forced medication claim. It granted Huffman qualified immunity, concluding that Harris did not prove that the sheriff's actions violated clearly established law. The court did, however, let the medication claim proceed against Clay County as municipal liability claims do not require plaintiffs to prove a violation of clearly established law.

So after summary judgment, the following claims remain: the detention claim against Huffman, Scott, and Clay County; the forced

---

[5] Harris also brought claims against the state court judges, but those claims are not part of this appeal.

medication claim against Clay County alone.  Huffman, Scott, and Clay County appeal.

## II

Before we address the merits, we must clear the jurisdictional thicket. Harris contends we cannot hear any of the defendants' appeals at this interlocutory stage.  That is right for some but not all defendants.

For this court to have interlocutory jurisdiction, the district court's decision as to each defendant must qualify as a collateral order.  *See Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995).  A collateral order is one that is "conclusive, that resolve[s] important questions separate from the merits, and that [is] effectively unreviewable on appeal from the final judgment in the underlying action."  *Id.*

The answer is straightforward for the decision denying summary judgment to Huffman and Scott in their individual capacities.  An officer's qualified immunity is "an *immunity from suit* rather than a mere defense to liability," and "it is effectively lost if a case is erroneously permitted to go to trial."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  The district court's denial of summary judgment—based on its determination that the officers were not entitled to qualified immunity—therefore qualifies as a collateral order.  *See id.*

That conclusion is not altered by Harris's argument that we lack jurisdiction because the district court's denial turned on a genuine dispute of material fact.  True, this court does not have jurisdiction to decide the genuineness of factual disputes.  *Cole v. Carson*, 935 F.3d 444, 452 (5th Cir. 2019) (en banc).  But we can determine whether those factual disputes, viewed in the light most favorable to the plaintiff, are "*material* to the application of qualified immunity."  *Samples v. Vadzemnieks*, 900 F.3d 655, 660 (5th Cir. 2018).  And we limit our jurisdiction to just that—whether,

viewing factual disputes in the light most favorable to Harris, Huffman and Scott violated clearly established law.

Harris is correct, however, that we lack jurisdiction over the ruling keeping Clay County in the case. Unlike the sheriffs, municipalities do not enjoy immunity. *Owen v. City of Independence*, 445 U.S. 622, 638 (1980). The argument that a municipality does not have a policy or custom that violates federal law is merely a defense to liability that, like most other defenses, can be reviewed after final judgment. *Burge v. Parish of St. Tammany*, 187 F.3d 452, 476 (5th Cir. 1999). We thus have repeatedly refused to treat summary judgment denials involving municipalities or officers sued in their official capacities as appealable collateral orders. *See Poole v. City of Shreveport*, 13 F.4th 420, 423 n.3 (5th Cir. 2021); *Trent v. Wade*, 776 F.3d 368, 388–89 (5th Cir. 2015); *Kinney v. Weaver*, 367 F.3d 337, 347 n.10 (5th Cir. 2004) (en banc).

Nor do we have pendent party jurisdiction over Clay County. Defendants assume that if Clay County's liability is "inextricably intertwined" with that of the individual officers, that provides "support [for] pendent appellate jurisdiction." But this court has never permitted—and has indeed rejected—pendent party (as opposed to pendent claim) interlocutory jurisdiction. *See Johnson v. Bowe*, 856 F. App'x 487, 491 n.5 (5th Cir. 2021) ("[T]he discretion to exercise pendent interlocutory appellate jurisdiction does not include pendent party interlocutory appellate jurisdiction . . . ."); *Zarnow v. City of Wichita Falls*, 500 F.3d 401, 407 (5th Cir. 2007) (refusing to recognize "so strange an animal as pendent party interlocutory appellate jurisdiction" (citation omitted)); *Burge*, 187 F.3d at 477–78 (no pendent party jurisdiction over municipality's appeal). Other circuits do sometimes exercise pendent party jurisdiction over orders involving municipalities when individuals with qualified immunity also

appeal,[6] but we do not. Bryan Lammon, *Municipal Piggybacking in Qualified-Immunity Appeals*, 126 Pa. St. L. Rev. 123, 141 (2021) ("[T]he Fifth Circuit [] appears to have rejected [municipal piggybacking]. . . . I could not find any Fifth Circuit decisions to the contrary.").

Often the practical difference in these approaches will be negligible. If, for example, we rule in an interlocutory appeal of a defendant with qualified immunity that there is no underlying constitutional violation, then it should be perfunctory on remand for the district court to enter an order applying that ruling to the benefit of a municipality. *See McKee v. City of Rockwall*, 877 F.2d 409, 413 (5th Cir. 1989) ("[T]he municipality will usually be able to reap in district court the benefits of a successful appeal by the city's individual co-defendants."). But our rule against pendent party interlocutory jurisdiction has a greater impact in this case: It means we cannot consider the forced medication claim that survived only against Clay County. And, of course, it means that we do not have interlocutory jurisdiction to decide whether any constitutional violation for detaining Harris is attributable to the county.

We thus dismiss Clay County's appeal and proceed to the merits of the individuals' appeal.

### III

The remaining merits issue is whether Huffman and Scott are entitled to qualified immunity for jailing Harris for six years after courts had found him incompetent and dismissed the commitment case. We decide that question de novo, accepting Harris's version of the facts and drawing

---

[6] *See, e.g.*, *Taffe v. Wengert*, 775 F. App'x 459, 462 n.2 (11th Cir. 2019); *Novoselsky v. Brown*, 822 F.3d 342, 357 (7th Cir. 2016); *Clubside, Inc. v. Valentin*, 468 F.3d 144, 161 (2d Cir. 2006) (Sotomayor, J.); *Huskey v. City of San Jose*, 204 F.3d 893, 905 (9th Cir. 2000).

inferences in his favor. *Kinney*, 367 F.3d at 347–49. The first qualified immunity question is whether the evidence allows a jury to find that the defendants violated Harris's due process rights. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). The second is whether that right is "clearly established." *Id.* An official's conduct violates a clearly established right when the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). That clearly established right, however, cannot be defined "at too high a level of generality." *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021). It must be "'particularized' to the facts of the case" establishing the right. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Anderson*, 483 U.S. at 640).

## A

The Fourteenth Amendment prohibits a state from confining a criminal defendant "solely on account of his incapacity to proceed to trial" for more than "the reasonable period of time necessary to determine whether there is substantial probability that he will attain that capacity in the foreseeable future." *Jackson*, 406 U.S. at 738. If there is no real probability that defendant will become competent, the state must institute civil commitment proceedings—to gauge the dangerousness of the defendant—or release him. *Id.*

Harris's prolonged detention violated *Jackson*. The circuit court held that he was incompetent and would not regain competency. Almost immediately after that, the chancery court dismissed the civil commitment proceeding. Without a chance at his competency being restored or a pending civil proceeding that could result in his commitment based on dangerousness, Harris was entitled to go free. Yet he remained in jail for six years. This

violated the commit-or-release rule that the Supreme Court recognized a half century ago. *See id.*

The sheriffs do not push back much against the notion that the Constitution required Harris's release.[7] They instead mostly argue that they are not responsible for any constitutional violation. Any fault, they contend, lies with the courts or prosecutor.

Courts, including ours, have rejected jailers' just-following-orders defenses in cases with much briefer unlawful detentions. *See Jones v. Jackson*, 203 F.3d 875 (5th Cir. 2000). Even when a detention was "pursuant to a valid court order," we held that detaining a defendant for nine months without bringing him before a judge offended his due process rights. *See id.* at 880–81. A recent case similarly held that "prolonged detention"—96 days—"without the benefit of a court appearance violate[d] the detainee's Fourteenth Amendment right to due process." *Jauch v. Choctaw Cty.*, 874 F.3d 425, 436 (5th Cir. 2017). Other circuits have come to similar conclusions when defendants were detained at length without being brought in front of a judge. *See Hayes v. Faulkner Cty.*, 388 F.3d 669, 675 (8th Cir. 2004) (38-day detention); *Armstrong v. Squadrito*, 152 F.3d 564, 567, 573–76 (7th Cir. 1998) (57 days); *Oviatt v. Pearce*, 954 F.2d 1470, 1474–77 (9th Cir. 1992) (114 days).

Harris did not see a judge from October 2010 to June 2016. During those more than 2,000 days, the circuit court never set a hearing. And no case was pending in chancery court. In fact, judges had reason to believe that

---

[7] We reject the sheriffs' argument that the state's commencement of the proceedings in 2010 was enough to satisfy the Supreme Court's command. *Jackson* would have no meaning if states could start commitment proceedings, terminate them, and then jail defendants indefinitely.

Harris was no longer detained.  A few days after Harris should have been released, Huffman and Scott signed the declaration testifying that Harris was not in the jail (this in a relatively small county with approximately 20,000 citizens and roughly 100 inmates at a given time).  That lie allows a factfinder to infer that Huffman and Scott were covering something up—that they knew there was no longer any basis to hold Harris.[8]  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (discussing the "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt'" (quoting *Wright v. West*, 505 U.S. 277, 296 (1992)).  Thus, the length of time Harris was held without a pending hearing—substantial as it was—is not the only basis for tying the sheriffs to the due process violation.

Indeed, this is not a case about jailers' following court orders that turned out to be unconstitutional.  These sheriffs held Harris in violation of a court order that followed *Jackson*'s commit-or-release rule.  After its competency ruling, the circuit court ordered that Harris "shall remain in custody *until* the determination of said civil proceedings."  Until that point, not longer.  That meant that once the chancery court ended the civil commitment proceedings—and remember it soon did—Harris should have been released.  This case is thus an easier one than the cases cited above in which jailers should have pieced together the need to release the defendant based on the passage of time without court action.  Here, the court's order

---

[8] Other holes in the sheriffs' story might also lead a jury to conclude that they knew it was unlawful to continue holding Harris on the initial charges.  For example, Sheriff Huffman told DA Allgood in 2012 that Harris was still in jail, contradicting his declaration. And while the sheriffs claim the prison assault capias was their basis for holding Harris, that could not be the case because the indictment was never served on Harris (and thus there was never a trial date or any other court hearing relating to that case).

informed the jailers what due process required. Holding Harris for six more years violated the court's instruction.

The sheriffs ignore that commit-or-release order and instead argue that they were detaining Harris "pursuant" to a different to court order. The order they refer to is the initial order to detain Harris issued after his bond hearing in April 2006. It cannot be that the initial detention order in a case overrides subsequent release orders and allows jailers to indefinitely hold defendants without consequence. As we said long ago of another sheriff's defense to a prolonged detention claim—he argued that his ignorance of a court's ordering the defendant's release excused him from liability—if that were the law then "nine months could easily be nine years, and those nine years, ninety-nine years, and still as a matter of law no redress would follow." *Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir. 1968).

Taking the evidence in Harris's favor, Huffman and Scott violated his due process right by detaining him for six years in violation of the commit-or-release rule and the circuit court's order enforcing that rule.

B

We now turn to whether this constitutional violation was clearly established. The district court determined that there was "at least some question" whether the cited authority was "sufficiently on point" to meet the clearly established prong, mistakenly believing that a key precedent was not temporally relevant.[9] It therefore relied on *Hope v. Pelzer* to conclude that

---

[9] The district court thought that *Jauch* was not relevant to the clearly established question because it was decided in 2017. But what matters is not when *Jauch* issued but when the events took place that it held violated clearly established law. *See, e.g.*, *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 341–42 (5th Cir. 2020). The *Jauch* detention occurred in 2012, by which time the law was already clearly established that a sheriff could

No. 21-60456

the sheriffs' actions were an "obvious" constitutional violation. 536 U.S. 730 (2002); *see also Taylor v. Riojas*, 141 S. Ct. 52 (2020) (reversing grant of qualified immunity because the violation was obvious).

Resort to obviousness is unnecessary. Binding precedent at the time of the sheriffs' conduct clearly established their due process violation.

We start with the entrenched commit-or-release rule: An incompetent defendant, who has no reasonable expectation of restored competency, must be civilly committed or released. *Jackson*, 406 U.S. at 738. There is no wiggle room in that principle. Its line is as bright as they come. It is also clear as day that Harris's detention after the October 2010 dismissal of his civil proceeding violated *Jackson*'s rule.

The only question, then, is whether it was clearly established that the sheriffs could be liable for this violation of Harris's clearly established due process right. We recently held that it has been established for decades that a sheriff can be liable for the unlawful detention of an inmate. *Jauch*, 874 F.3d at 431 (citing *Jones*, 203 F.3d at 880–81). That law recognizes that jailers can be liable when "prolonged detention without the benefit of a court appearance violates the detainee's Fourteenth Amendment right to due process." *Jauch*, 874 F.3d at 436 (citing *Jones*, 203 F.3d at 880–81). That principle later defeated a sheriff's qualified immunity defense in *Jauch*. *Id.*

Given the material similarities between this case and *Jauch*, that principle defeats qualified immunity for these sheriffs too. Both Jauch and Harris were pretrial detainees, yet to plead guilty or have a trial. *Id.* at 428. Both spent an indefinite period of time in jail. *Id.* For Jauch, months; for Harris, years. And during their prolonged detentions, neither Jauch nor

be responsible for an unlawful detention. 874 F.3d at 436. The source of that notice is a 2000 decision from this court. *Id.* (citing *Jones*, 203 F.3d at 880–81).

Harris had access to the courts. Harris, for his part, did not even have a court date on the calendar. Judged by these metrics, it would seem that the constitutional violation here is even more severe than the one in *Jauch*.

And a sheriff's responsibility for the unlawful detention of an inmate long predates *Jauch* and *Jones*. We held decades earlier that a jailer's authority to detain is "terminated by the actions of a court of competent jurisdiction." *Whirl*, 407 F.2d at 791. *Whirl* thus held that when, as here, a court's decision to end an inmate's detention "has become a matter of public record," the sheriff is at fault for keeping him in custody. *Id*. at 792 (explaining that "[t]he responsibility for a failure of communication between the courts and the jailhouse" falls on the jailer).

The sheriffs, however, contend that our precedent did not put them on notice, pointing to two differences between *Jauch* and this case. First, they argue that unlike Jauch, Harris was brought before a judge at the beginning of his case. It was at that hearing that the court denied bond for Harris, which they claim was sufficient process under *Jauch*. But the case *Jauch* relied on for the clearly established right against "prolonged detention" without court access shows that it is not limited to defendants who never had an initial appearance. Jones had a hearing during which some charges were dismissed (police had arrested the wrong person) before his nine-month detention that violated due process. *Jones*, 203 F.3d at 878.

The second *Jauch* distinction the sheriffs point to actually shows that notice of unlawfulness is much stronger in this case. Jauch was indefinitely detained pursuant to a court policy, while Harris was not. In other words, the *Jauch* sheriff did have a just-following-orders defense. Yet that excuse did not allow him to defeat qualified immunity. 874 F.3d at 436–37. If a sheriff who complies with a court's policies can be liable for holding an inmate in violation of due process, then it necessarily follows that a sheriff

14

who violates a court order can be liable for a due process violation that results from that defiance. *Cf. Whirl*, 407 F.2d at 791 (recognizing that unlike "errors in a [facially-valid] warrant," which are subject to the control of the courts, sheriffs are responsible for holding a prisoner "in jail without a court order or written mittimus").[10]

Huffman and Scott thus had greater notice that their conduct violated the prisoner's due process rights than did the *Jauch* sheriff. The unlawful detention here was years longer than the detentions in *Jauch* and *Jones*. It violated a court order.[11] On top of all that is the sheriffs' lie that Harris was no longer in the jail, evidence that they knew Harris was being held unlawfully. Consequently, the sheriffs' liability for violating the commit-or-release rule is clearly established. *See Jauch*, 874 F.3d at 436 (reasoning that the sheriff was not entitled to qualified immunity because his "claim to qualified immunity [was] less compelling" than was the claim of the *Jones* defendants); *see also Dyer v. Houston*, 964 F.3d 374, 384–85 (5th Cir. 2020) (denying qualified immunity because the case arguably presented a "clearer case of deliberate indifference" than an earlier case denying qualified immunity); *Timpa v. Dillard*, 20 F.4th 1020, 1036 (5th Cir. 2021) (denying qualified immunity because the officer's use of excessive force was more severe than in earlier cases denying qualified immunity). As the law has long recognized, "[i]gnorance and alibis by a jailer should not vitiate the rights of a man entitled to his freedom." *Whirl*, 407 F.2d at 792.

---

[10] Even if there were some logic to the sheriffs' position that compliance with a court policy in *Jauch* made that a stronger rather than weaker case for liability, it again bears noting that there was no such policy in *Jones*. *See* 203 F.3d at 878.

[11] Under Mississippi state law, it "shall be the duty of every sheriff to keep a record, to be called the 'Jail docket,' in which he shall note . . . on what authority [and] how long the prisoner was so imprisoned." MISS. CODE ANN. § 19-25-63.

No. 21-60456

\*\*\*

We DISMISS Clay County's appeal for lack of jurisdiction and AFFIRM the district court's denial of summary judgment as to Huffman and Scott.